## KEENAN & WADE *v.* CITY OF TRENTON.*

### (*Jackson.*  April Term, 1914.)

1. **MUNICIPAL CORPORATIONS.  Power to Light Streets.  Incidental powers.**

An express grant of power to a municipality to light streets carries, by implication, power to construct or acquire by purchase a lighting plant for that purpose.  (*Post, p.* 76.)

Acts cited and construed:  Acts 1903, c. 551, sec. 7; Acts 1907, c. 488.

Cases cited and approved:  Rushville Gas Co. v. Rushville, 121 Ind., 206;  Mauldin v. Greenville, 33 S. C., 1;  Ellinwood v. Reedsburg, 91 Wis., 134;  Jacksonville Electric Light Co. v. Jacksonville, 36 Fla., 229;  Fawcett v. Mt. Airy, 134 N. C., 129;  Overall v. Madisonville, 125 Ky., 684;  Crouch v. McKinney, 47 Tex. Civ. App., 54.

Cases cited and distinguished:  Smith v. Nashville, 88 Tenn., 464;  City of Crawfordsville v. Braden, 130 Ind., 149.

2. **MUNICIPAL CORPORATIONS.  City of Trenton.  Power to purchase light plant.**

The city of Trenton, under its charter (Acts 1903, ch. 551, sec. 7, authorizing the city council to pass all ordinances necessary for the proper government and general welfare of the city, etc., and Acts 1903, ch. 551, sec. 2, as amended by Acts 1907, ch. 488, sec. 1, subd. 10), "to provide for lighting the streets," could purchase an electric light plant, even though it were a part of its purpose or plan in so doing to furnish electric current for

*As to the power of municipal corporation to own and operate electric light plant, see notes in 14 L. R. A., 268 and 15 L. R. A. (N. S.), 711.

private, as well as public, consumption in the production of lights. (*Post, pp.* 75-77.)

Cases cited and distinguished: Mauldin v. Greenville, 33 S. C., 1.


3. , MUNICIPAL CORPORATIONS.    Ordinances.

Where a city charter commits the decision of the making of a corporate contract of purchase to the city council, and is silent as to the mode of its exercise, the decision may be evidenced by a resolution, and need not necessarily be by an ordinance. (*Post, pp.* 79, 80.)

Cases cited and approved: Board of Education v. De Kay, 148 U. S., 591; Illinois Trust, etc., Bank v. Arkansas City, 76 Fed., 271; Newman v. Emporia, 32 Kan., 456; Paterson v. Barnet, 46 N. J. Law, 62; Board, etc. v. East Tenn., etc., Co., 115 Fed., 307; Sedalia v. Donohue, 190 Mo., 407.


4. MUNICIPAL CORPORATIONS.    Ordinances.

Under the charter of the city of Trenton (Acts 1903, ch. 551, sec. 7, and Acts 1903, ch. 551, sec. 2, as amended Act 1907, ch. 488, sec. 1, subd. 10), providing that the city council shall have power by ordinance to provide for lighting the streets, such power can only be exercised by ordinance, and not by resolution. (*Post, p.* 80.)


5. MUNICIPAL CORPORATIONS.

Where a municipality had power under its charter to purchase an electric light plant, it was liable under an implied promise for the reasonable value so purchased and used by it, though the power was not properly exercised by the city council, and though bonds voted to pay for it were invalid. (*Post, pp.* 80-82.)

Cases cited and distinguished: Hitchcock v. Galveston, 96 U. S., 341; Houston, etc., R. Co. v. Texas, 177 U. S., 92.

Cases cited and approved: Land Company v. Jellico, 103 Tenn., 320; State v. Knoxville, 115 Tenn., 184.

Keenan v. Trenton.

6. **ESCROWS.    Nature and Requisites.**

A deed cannot be delivered to the grantee as an escrow, and, if it is delivered to him, it becomes an operative deed freed from any condition not expressed in the deed itself. (*Post, p.* 84.)

Cases cited and distinguished:  Alexander v. Wilkes, 11 Lea, 221.

FROM GIBSON.

Appeal from the Chancery Court of Gibson County. —Colin P. McKinney, Judge.

V. H. Holmes, M. H. Taylor, J. R. Deason, and Tyree & Bryant, for City of Trenton.

Cooper & Clark, Walker & Landrum, and W. C. Caldwell, for Keenan & Wade.

Mr. Justice Williams delivered the opinion of the Court.

The bill of complaint was filed by Keenan & Wade, a firm, to recover of the city of Trenton $9,300, and interest, alleged to be due as the purchase price of an electric light plant alleged to have been sold by complainants to the city.

The plant had been owned and operated in Trenton by complainants for several years; they furnishing lights to the city and its inhabitants under franchise contracts with the city. The city determined to acquire and operate its own plant, and negotiations were begun between its officers and complainants which re-

sulted in an offer to sell the existing plant for $9,300 in cash. The city council submitted the proposition to a vote of the people of Trenton at a nonlegal primary election, in April, 1910; the majority vote being in favor of the purchase. No formal action by way of ordinance or resolution was taken at that time by the council as the result of this election; but another election was called and held in May, 1910, for an authorization of the issuance of municipal bonds to the amount of $12,000, under an enabling act of the legislature, to provide a fund for the payment of the $9,300 to Keenan & Wade. Efforts were made to market the bond issue, but they failed. It was then proposed by the city that Keenan & Wade buy the entire issue at par, $9,300 of the proceeds to be applied in payment of the plant, and the remaining $2,700 to be paid to the city. There was no delivery of the bonds to complainants, but they endeavored to place them on the market without success, due to the fact that attorneys for bond buyers gave an opinion that the bond election was conducted in a way that rendered the bonds invalid. In this opinion the city's attorney concurred.

Keenan & Wade had prior to this executed a deed to the plant, pole lines, etc., to the city, of date September 1, 1910, and a bond obligating that firm to the city to restore in good condition to the plant a dynamo which was then away at a factory for repairs. These instruments, deed and bond, are referred to in more detail below.

In September, 1910, the city took charge of the plant, its rents, issues, and profits. On November 2, 1910, the city gave notice to the complainant firm demanding the return of the dynamo above referred to, or that suit would be brought on the bond relating thereto.

Later on in November, 1910, the city council directed the mayor to surrender the possession of the plant to Keenan & Wade. That firm declined to accept a redelivery or to consider the contract terminated. When it became apparent, as above stated, that the bonds attempted to be voted were invalid, complainants demanded that the city call and hold another election for the purpose of authorizing an issue of bonds that would be free from the objections pointed out. The city agreed to do so on condition that complainants would abide the results, in the sense of treating the sale contract annulled or terminated in event the election was not carried for the bonds. Keenan & Wade declined to consent to this. The city denying liability, proceeded to construct for itself a new plant. The plant which had been the subject-matter of the negotiations outlined above was left idle to go to rust and decay. Complainants filed the bill to enforce their rights against the city.

The chancellor decreed in favor of the complainant firm; the city appealed to this court, and has assigned errors.

The charter of the city of Trenton contained the following provision:

"The city council shall have power to pass all such ordinances as may be necessary to provide for the proper government and the general welfare of the city. Such ordinances are to be passed at two meetings by a majority vote." Acts 1903, ch. 551, Sec. 7.

There was in this act no more definite or detailed grant of powers of any sort for the lighting of the city.

This charter was therefore amended by Acts 1907, ch. 488, so as to provide among other things, in section 1 (10), that:

The "city council shall have power by ordinance within the city to provide for lighting the streets."

It is affirmed by complainants, and denied by defendant city, that the city of Trenton had power under its charter, thus amended, to acquire by purchase the Keenan & Wade plant, for the twofold purpose: (1) Of lighting the city streets; and (2) of lighting the homes and business houses of private citizens or inhabitants. It is argued in behalf of the city that express and specific legislative authorization is necessary in order to the purchase or maintenance by a city of a lighting plant for the furnishing of lights even for the first-named purpose, but we deem the law to be too well settled to the contrary to require any elaboration. The great weight of authority is to the effect that an express grant of power to light streets, carries by necessary implication power to construct or acquire by purchase a lighting plant for that purpose. *Rushville Gas Co.* v. *Rushville,* 121 Ind., 206, 23 N. E.,

72, 6 L. R. A., 315, 16 Am. St. Rep., 388; *Mauldin* v. *Greenville*, 33 S. C., 1, 11 S. E., 434, 8 L. R. A., 291; *Ellinwood* v. *Reedsburg*, 91 Wis., 134, 64 N. W., 885, and cases cited below.

In respect to the right of a city to construct, purchase, or maintain such a plant for supplying electric current to private consumers there is a lack of harmony in the reported cases; but we believe that the trend of the later cases is in favor of power to that end in municipal corporations; and, in our opinion, the current of authority to that effect must increase, reason and the spirit of the age alike demanding it.

An early and leading case announcing the rule applicable to a municipality is *Smith* v. *Nashville*, 88 Tenn., 464, 12 S. W., 924, 7 L. R. A., 469 (1889), it being in respect of a city's engaging in furnishing a necessity, water, to itself and its inhabitants, under a charter power "to provide the city with water by waterworks." The court said:

The clause "was obviously intended to authorize the corporation to furnish the inhabitants of the city with water. . . . It cannot be held that the city, in doing so, is engaging in a private enterprise of performing a municipal function for a private end. It is the use of corporate property for corporate purposes. . . . It is not a strictly-governmental or municipal function, which every municipality is under legal obligation to assume and perform, but it is very close akin to it, and, should always be recognized as within the

scope of its authority, unless excluded by some posi-
tive law."

This case of *Smith* v. *Nashville* was quoted with ap-
proval and followed as a basic authority by the Su-
preme Court of Indiana, in dealing with the question
of the power of a municipality to acquire and operate
an electric plant for such twofold purpose. In *City
of Crawfordsville* v. *Braden*, 130 Ind., 149, 28 N. E.,
849, 14 L. R. A., 268, 30 Am. St. Rep., 214 (1892), it
was held that a city has this as one of its inherent and
implied powers, no express legislative grant of pow-
er there appearing. The court said:

"The corporation possessing, as it does, the power
to generate and distribute throughout its limits elec-
tricity for the lighting of its streets and other public
places; we can see no good reason why it may not also,
at the same time furnish it to the inhabitants to light
their residences and places of business. To do so is,
in our opinion, a legitimate exercise of the police power
for the preservation of property and health."

And, after quoting *Smith* v. *Nashville*, it continued:

"While the authorities, on the precise question, are
meager, we think the weight of authority, as well as
of reason, tends to sustain the right of the munici-
pality . . . to furnish light as well as water to its
inhabitants, not only in its public places, but in their
private houses and places of business."

The following cases are on principle in accord,
*Jacksonville Electric Light Co.* v. *Jacksonville*, 36 Fla.,
229, 18 South., 677, 30 L. R. A., 541, 51 Am. St. Rep.,

24; *Fawcett* v. *Mt. Airy,* 134 N. C., 129, 45 S. E., 1029, 63 L. R. A., 872, 101 Am. St. Rep., 825; *Overall* v. *Madisonville,* 125 Ky., 684, 102 S. W., 278, 12 L. R. A. (N. S.), 433; *Crouch* v. *McKinney,* 47 Tex. Civ. App., 54, 104 S. W., 518, and hold that under a general grant of power to light streets there is implied power to furnish current for lights to private consumers.

In *Maudlin* v. *Greenville,* 33 S. C., 1, 11 S. E., 434, 8 L. R. A., 291, it was held that, under a grant of power no more specific than property holding and general welfare clauses, it was not within the power of a city to supply private consumers, but that case and accordant authorities do not conflict with what we here hold; that under the charter of the city of Trenton, as amended, that municipality had power to acquire complainants' plant, even though it was a part of its purpose or plant in so doing to furnish electric current for private, as well as public, consumption in the production of lights. The lighting of private premises in no inconsiderable degree aids the city authorities in policing the city limits, or by way of suppressing crime. The city oftentimes gets an incidental lighting of its streets from lights in or about private homes, grounds, and places of business. To our minds this case cannot be differentiated in principle from one involving the question of a supply of water to private consumers by a municipality.

But it is by the city contended that, if this power exists, it was not so exercised under the charter as that the city was bound, in that the purchase from com-

plainants was not effected by an ordinance of its council, but was attempted to be made by a resolution.

While the general rule is that, when a charter commits the decision of a matter such as this, the making of a corporate contract of purchase, to the city council, and is silent as to the mode of exercise, the decision may be evidenced by a resolution, and need not necessarily be by an ordinance (*Board of Education* v. *De Kay,* 148 U. S., 591, 599, 13 Sup. Ct., 706, 37 L. Ed., 576, and cases cited; *Illinois Trust, etc., Bank* v. *Arkansas City,* 76 Fed., 271, 22 C. C. A., 171, 34 L. R. A., 518; 2 Dill. Mun. Corp. [5th Ed.], Secs. 571, 572, and notes), yet the legislative stipulation, here appearing, that the manner of exercise should be by way of ordinance made it incumbent, in order to validity, that such more deliberate form of authorization should have been adopted (*Newman* v. *Emporia,* 32 Kan., 456, 4 Pac., 815; *Paterson* v. *Barnet,* 46 N. J. Law, 62; *Board, etc.,* v. *East Tenn., etc., Co.,* 115 Fed., 307, 53 C. C. A., 132; *Sedalia* v. *Donohue,* 190 Mo., 407, 89 S. W., 386, 4 Ann. Cas., 89; 28 Cyc., 322, 348). So wide a departure from the previous method of city lighting should have conformed to the charter requirement in this regard, failing in which the steps taken by mere resolution, not twice passed, must fail as invalid. It is urged by complainants that, under this rule, no payment for fuel used at such a plant, or for repairs or supplies, could be validly made without the passage of a particular authorizing ordinance. This insistence overlooks the fact that the ordinance may

be made so general and comprehensive in terms as to vest authority in agents in reference to such matters of detail.   2 Dill. Mun. Corp. (5th Ed.), Sec. 572.

It does not follow from what has just been said that the city of Trenton cannot be made to respond for the value of the plant, notwithstanding the invalidity of the step, by resolution, taken towards its purchase, and notwithstanding the invalidity of the bonds attempted to be sold by it under the election irregularly held.

If the city took title to, and possession of, the plant, under an executed contract, it will be held to pay its value.   As seen, the city had the power to purchase, and mere invalidity of that which was attempted in the exercise of that power does not prevent from attaching and continuing the city's obligation to pay, implied from the transaction.

In *Hitchcock* v. *Galveston*, 96 U. S., 341, 350, 24 L. Ed., 659, it was said:

"They [plaintiffs] are not suing upon the bonds, and it is not necessary to their success that they should assert the validity of those instruments.   It is enough for them that the city council had power to enter into a contract for the improvement of the sidewalks; that such a contract was made with them; that under it they have proceeded to furnish materials and do work, as well as to assume liabilities; that the city has received, and now enjoys, the benefit of what they have done and furnished; that for these things the city promised to pay; and that after having received the benefit of

130   Tenn.—6

the contract the city had broken it. It matters not that the promise was to pay in a manner not authorized by law. If payments cannot be made in bonds because their issue is *ultra vires,* it would be sanctioning rank injustice to hold that payment need not be made at all. Such is not the law. The contract between the parties is in force, so far as it is lawful. . . .

"The promise to give bonds to the plaintiffs in payment of what they undertook to do was therefore, at farthest, only *ultra vires;* and, in such a case, though specific performance of an engagement to do a thing transgressive of its corporate power may not be enforced, the corporation can be held liable on its contract. Having received benefits at the expense of the other contracting party, it cannot object that it was not empowered to perform what it promised in return, in the mode in which it promised to perform."

The above case was approved in *Houston, etc., R. Co.* v. *Texas,* 177 U. S., 92, 20 Sup. Ct., 555, 44 L. Ed., 685, Mr. Justice Peckham saying:

"Suppose in the *Hitchcock Case* the bonds had been issued by the city in violation of its charter. Could not the city thereafter, upon discovering its inability to make such a contract, receive the bonds back and make payment in some other way?"

The same case and the same principle have been approved by this court in *Land Company* v. *Jellico,* 103 Tenn., 320, 52 S. W., 995, where it was said that where a city takes benefits for which its council might well have contracted, proceeding properly, the city will not

be heard to deny liability therefor; that in such case liability arises by implication of law, and payments must be made according to benefits received. The law, which always intends justice, implies a promise. See, also, *State* v. *Knoxville,* 115 Tenn., 184, 90 S. W., 289; 28 Cyc., 1637, 1638.

It is contended, however, on the part of defendant city, that the above rule of *quantum meruit* is not to be applied here, for that it is claimed the contract was never an executed one or more than tentative, in that it was the intention of the city council to cause the contract and deed for the conveyance to the city of the plant and franchise to be lodged in escrow; that all the papers were placed in the vault of the Farmers' Exchange Bank, of Trenton, not to be delivered until the $9,300 of bonds were engraved and delivered to Keenan & Wade; that they were in such escrow when the invalidity of the purposed bond issue was disclosed; and that consummation failed not because of anything done or left undone by the city.

The defendant misconceives the nature of an escrow. The deed, so far as Keenan & Wade were concerned, was delivered to the city, and in no sense to such third person. The facts appear to be that in the meeting of the council next following the delivery of the deed, and other papers to the city, a resolution was passed accepting all the papers and reciting in respect of the deed:

"We accept deed offered by Keenan & Wade and [order] that the papers be put in the vault of Farmers' Exchange Bank until the bonds are delivered."

This does not evidence any participation on the part of Keenan & Wade in the matter of the lodgment of the deed; nor is intent manifested on the part of the city that an escrow was purposed. An agreement of both parties to an escrow is necessary to its creation. It is the grantor's delivery that is either absolute or into escrow, and here their only delivery was to the city itself. The general rule is that a deed cannot be delivered to the grantee as an escrow. If it be delivered to him it becomes an operative deed freed from any condition not expressed in the deed itself; this, though the parties meant an escrow. 1 Devlin, Real Estate, Sec. 314, quoting *Alexander* v. *Wilkes,* 11 Lea, 221, 225, and citing numerous cases.

In view of this acceptance by the city's governing body, of the fact that the city went into possession of the plant, operated it, and made repairs and changes in the poles, globes, etc., of the fact that the city stood upon, and gave notice of enforcement of, its rights under a bond delivered to and deposited by the city at the same time and in like manner, there is manifested plainly an absolute delivery of the deed and a contract consummate as to vestiture of title.

The next insistence in behalf of the city of Trenton is that it, through its mayor, under direction of its council, tendered back the plant, and did all that it could to rescind and to put the vendors in *statu quo;*

complainant declining that this terminated any right to a recovery for benefits received. There is no need of an extended discussion of this contention, since it appears that the complainants were not tendered all that they transferred to the city; notably the franchise conveyed in the deed, and the rental value of the plant while so held. Further, they lacked much of being offered their original status, nor can they now be restored thereto. It appears that the vendors materially scaled, in the deal, a bill that had accrued for lights furnished the city before the transfer of the plant and were paid on the reduced basis. No offer to remedy this was ever made. Since the purported tender back of the plant proper the city has declared the franchise forfeited and has constructed a new plant, and is engaged in furnishining its own street lights and supplying private consumers, so that, were complainants placed in possession of the old plant, they would not have the city as a customer, as it stood under the contract in existence on sale date, or be in the same position to induce the city to continue as their patron.

In looking to the proof of the value of the plant, we are of opinion that it should be reckoned on the basis of a going concern, of a consumers' record or custom built up during years of effort, as well as on the value of the physical property; and in so doing we believe that the result reached by the chancellor was a just one. Affirmed.